## Shanks v. Commonwealth, on Relation, etc.

(Decided, March 25, 1927.)

### Appeal from Franklin Circuit Court.

1. States.—Expenses incurred by state auditor in attending national convention of state auditors in another state held not expenses incurred in discharge of official business within meaning of Acts 1924, c. 112, section 53, authorizing payment therefor under section 5.

2. Constitutional Law.—Authorization by commissioners of sinking fund for state auditor to attend national convention is not conclusive on whether expenses incurred thereby were incurred on official business within meaning of Acts 1924, c. 112, sections 5, 53, and did not foreclose authority of court to inquire into and adjudicate it.

JOHN D. CARROLL and GUY BRIGGS for appellant.

FRANK E. DAUGHERTY, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

During the year 1924 the appellant and defendant below, W. H. Shanks, was the duly elected, qualified and acting Auditor of Public Accounts for the Commonwealth of Kentucky. On August 7 of that year he procured a check from the State Treasurer payable to himself for the sum of $269.25, which he afterwards cashed and which was issued pursuant to a warrant that he as such Auditor of Public Accounts, through his deputy, issued in his individual favor for the same amount. This action was filed against him in the Franklin circuit court by the commonwealth, on relation of its Attorney General, to recover from him the amount of the check on the ground that it was both issued and collected without authority of law. The answer denied the illegality alleged in the petition as grounds for recovery, and relied

on sections 5 and 53 of chapter 112, Acts of 1924, commonly known as the "Budget Act," as authority for the treasurer to issue and defendant to collect the amount of the check. Section 5 of that act appropriates as the maximum amount for "traveling expenses" for the Auditor the sum of $4,000.00, and its section 53 says: "No officer or employe of the state, or any of the departments, boards, commissions or agencies of the state government provided for in this act, shall be allowed any expense incurred in trips outside of Kentucky except on *official business,* and then only after a request to make such trips has been filed in writing with the Commissioners of the Sinking Fund, and authority to make same has been approved by the said Commissioners of the Sinking Fund." It was alleged in the answer that the check issued to defendant by the State Treasurer represented the amount of defendant's expenses in attending a National Convention of State Auditors, held in Salt Lake City, Utah, and which was a short while before the issuing of the check, and that such expenses were incurred by him in the discharge of "official business" within the contemplation of section 53 *supra,* and that before making the trip or incurring same he procured the authority of the "Commissioners of the Sinking Fund" for the purpose. The demurrer filed to the answer was sustained by the court, and defendant declining to plead further, judgment was rendered against him and he has filed transcript of the record in this court with motion for an appeal.

Two arguments are vigorously made against the correctness of the judgment, which are: (1), that the expenses incurred by defendant in attending the National Convention of the State Auditors was "official business," but, if mistaken, then (2), the authority to make the trip and to incur the expenses, given to him by the Commissioners of the Sinking Fund, was and is conclusive of the question and foreclosed the authority of the court to inquire into or adjudicate it. The commonwealth controverts both of those arguments, and in addition urges (as was set out in the petition and admitted by, but sought to be avoided in the answer) that defendant did not comply with the provisions of section 359a-1 by failing to take and file receipts for each item of his expense as therein prescribed, and further, that he did not request the Commissioners of the Sinking Fund "in writing" the authority to incur the expenses; but, since the real purpose of this action is to obtain a construction of sec-

tion 53 *supra,* of the Acts of 1924, we have determined, in view of the conclusions reached, to disregard the last two contentions made by the commonwealth and to address ourselves in this opinion exclusively to arguments (1) and (2) *supra,* which we will now proceed to do in the order mentioned.

1. In disposing of argument (1) we are confronted with the same difficulty frequently met with by us, *i. e.,* that it is sometimes much easier to determine what lies outside of the meaning and scope of the word or phrase under consideration than it is to define with precision what is included by it, and which we have found by our investigation to be particularly true with reference to the phrase ''official business.'' The words are ordinary ones, and under the well settled rule they should receive the interpretation, in the absence of something to the contrary, that is usually understood by people generally in using them. To the average mind the words convey and would be understood as including all the activities of the officer in the discharge of his official duties, which are always expressly prescribed by statute or necessarily inferred from express provisions.

We have numerous statutes prescribing the duties of all state officers, including that of Auditor of Public Accounts, and we have been unable to find, after diligent search, nor has learned counsel pointed out to us any statute, either expressly or by necessary implication, authorizing the Auditor of Public Accounts to expend the public funds of the commonwealth for purposes of an educational nature only, and which is necessarily the sole purpose of attending the convention at Salt Lake City. The only benefit that the people of the commonwealth could possibly reap from such an expenditure, if any, would be exceedingly remote, and even such benefit would not appertain to the correctness and accuracy with which the auditorial duties should be performed (and which is the primary purpose of the office), but relate more to the method by which such accuracy and correctness were obtained. As is pointed out in the answer, when its substance is stated, the information to be gained by attendance upon such conventions was for the purpose of keeping abreast with the advanced methods of bookkeeping. The propriety of new and advanced legislation affecting the duties of any officer comes within the official duties and business of the legislator more than that of the officer. In human affairs

it is scarcely possible to imagine anything that upbuilds and advances even a single member of society that does not also remotely benefit all other members of the same society. Following out that idea the people served by any officer would be remotely benefited by his improved equipment for the discharge of the duties of his office, and everything that even slightly added to his equipment could be said to be a part of his *official business,* if such remote consequences to the public are to be looked to in measuring the definition of the words. So that, if it is ''official business'' for the Auditor of Public Accounts to attend such a convention at any place within the limits of the United States, then it would be, by the same token, official business for him to attend conventions in other countries and nationalities of a similar nature, since the statute under which defendant seeks to justify his expenditure, as being incurred in the discharge of ''official business,'' does not limit the incurring of them or the performance of such alleged official business within the confines of the United States, but only when they are incurred outside of Kentucky, which necessarily means anywhere on the globe.

Likewise, if such trips may be classified as ''official business'' because of the remote benefits that the people of the commonwealth might reap thereby, then with equal propriety must it be held that the Treasurer, the Secretary of State, the Banking Commissioner, Commissioner of Motor Transportation, and all other officials and heads of the various state departments would likewise be discharging their ''official business'' when in attendance upon such conventions of similar officers held outside of the limits of the commonwealth. It would include the Governor and the members of this court, since bar associations held throughout the world are as much enlightening in their programs to judicial officers in the discharge of their duties as is the proceedings of a convention like the one under consideration. We are convinced that the construction contended for is not only exceedingly Utopian in character but was never intended by the legislature in the enactment of the statute, and which brings us to a brief inquiry as to the purpose the legislature had in view in enacting it.

It is a matter of common knowledge and a part of the history of the country that a great many official duties involved in the transaction of official business has been and must be performed outside of the state, and which

has been so from the time it became such. With the increase of population, public business and intercourse between the states is necessarily followed by an increase of the amount of official business to be performed outside of the state. Until the enactment of the statute in question, or at any rate up to comparatively recent years, various officers having official duties calling them outside of the state were their own judges as to whether they would incur the expenses, to be paid always out of the public treasury. If it was strictly official business the expenses would be paid with no question made, but experience taught on many occasions the expenses incurred, although on official business, exceeded the financial benefit obtained by the public, and on some occasions such expenses had been demanded and sometimes paid when the business transacted by the official outside of the state only remotely, if at all, appertained to the public business. Therefore, in enacting section 53 *supra*, the legislature had in mind, as it did do therein, to, not only prohibit the incurring of such expenses, except in the transaction of official business, but, likewise, to prohibit the officer incurring them without the approval of the Commissioners of the Sinking Fund.

Some illustrations will clarify what we have said. A fugitive from justice, who, under the Constitution of the United States was extraditable, might be arrested in the state of Washington, either under a misdemeanor charge or that of a low grade of felony. The cost incurred in apprehending him and sending the sheriff of the county after him would greatly exceed any possible beneficial purpose in bringing him back to the commonwealth. Again, the state might be financially interested in some litigation pending in New York, but only to the extent of, say $25.00, when the expenses of the Attorney General to look after the matter on behalf of the state might amount to ten or twenty times that much. The legislature, realizing such facts, enacted that notwithstanding the foreign business might be official business, yet no expenses should be incurred in looking after or attending to it without first obtaining the authority of the commissioners of the Sinking Fund. If such was not the intention of the legislature in enacting the statute it is difficult for us to conceive what could have been its purpose.

It must be remembered that we are not dealing with a case where the legislautre *in express terms* has authorized the expenditure and thereby, in effect, said that it *was* incurred in the discharge of *official business.* To illustrate; if in this case the legislature, either in sections 5, 53 or any other part of the statute *supra,* had expressly said, that traveling expenses in attendance upon such conventions as the one here involved should be regarded as "official business" an entirely different question would be presented; but even in that case the legislative fiat in authorizing such expenditures would not necessarily conclude the courts in determining whether the expenditures were for a public purpose, which is the only one for which taxes may be levied and collected under the provisions of section 171 of the Constitution. See Bosworth v. Harp, 154 Ky. 559, 157 S. W. 1084, and others of like import, some of which are referred to therein. But we will have more to say on this phase of the case in disposing of argument (2), *post.*

Independently of the foregoing considerations, our investigation of the question convinces us that all courts, before which the question now being considered has been presented, have determined it adversely to appellant's contention. The direct question involving the right of officials to incur expenses to be paid out of public funds in attendance upon associations and conventions, supposed to be enlightening and improving to the particular officer, was involved in the cases of Beauchamp v. Snider, 170 Ky. 220, 185 S. W. 869; Waters v. Bonvouloir, 172 Mass. 286, 52 N. E. 500; Stevens v. Sedgwick Co., 5 Col. App. 115, 37 Pac. 948; Smith v. Holovtchiner, 101 Neb. 248, 162 N. W. 630, 1917E L. R. A. 331; Hitchcock v. State, 34 S. D. 124, 147 N. W. 284; James v. Seattle, 22 Wash. 654, 79 A. S. R. 957, 62 Pac. 84, and Lake County v. Neuenfeldt (Ind.), 136 N. E. 580. The Snider case involved the right of a county school superintendent to take credit by certain expenses made by her in the alleged discharge of the duties of her office, and which, of course, she claimed was "official business." One item of expenses for which she sought a credit was $31.65 incurred while attending the sessions of the Kentucky Educational Association at Louisville. We disallowed it for two reasons, one being that the involved statute permitted and allowed only "necessary expenses" of the school superintendent in discharging the duties of her office;

and the other was, that such expenses should be made in
the county. It was held that the expenses incurred in
attending the session of the association were not neces-
sary to the discharge of the duties of the office, although
in a remote way it might serve to further equip the
county superintendent for the discharge of her "official
duties," and in disposing of that question we said:

> "Many things might be imagined to, in a re-
> mote way, make the school system of the county
> more efficient; for instance, that the school trustees
> of the county be highly educated men, and the same
> as to the members of the board. It would even serve
> to advance more rapidly the pupil if its parents were
> sufficiently educated to assist in teaching and in-
> structing it when not in school, and it would, per-
> haps also, at least according to the views of some,
> assist to have well equipped baseball parks and golf
> links for the purpose of affording proper recreation
> and physical development. It might also be re-
> garded by some as essential to the more efficient de-
> velopment of the schools, that each child be neatly
> and tidily dressed and that none shall excel others in
> this particular, but all be placed upon a par in the
> matter of dress. But, manifestly, even though it be
> conceded that in some possible way these things
> might subserve a useful purpose in the school, the
> board would be wholly unauthorized to expend any
> of the money for such purposes."

We likewise held that the expenses were not incurred
in the county as the then prevailing statute required, but
both questions were squarely presented and both deter-
mined. So that, the fact that the determination of only
one of them would have sufficed to settle the case does not
make what was said in determining the other *obiter dic-
tum*. We so held in that case, notwithstanding the county
board of education was vested with a large discretion as
to expenses incurred by it and its members "in making
an efficient system of schools in the county." What we
said there we regard as having a greater application to
the facts of this case, since all the functions of the officer
there involved related to education and not to merely
ministerial duties as are those of the Auditor. Since
rendering that opinion the legislature has expressly
enacted that attendance by county school superinten-
dents and teachers upon the meetings of the Educational

Association shall, not only be a part of their official duties, but that the expenses incurred may be paid out of the public treasury. Indeed, our statutory school law as so amended makes the State Educational Association a part of the machinery of the public school system of the state, upon the theory that all of such requirements have a direct tendency to the betterment of public educational facilities. There is no such legislative declaration concerning the expenses here involved, and we are to determine it solely from a proper definition of what is involved in the phrase "official business," the same as we were called upon in the Snider case to determine the scope of "necessary (official) expenses."

In the Waters case the city council of the city of Holyoke, in Massachusetts, undertook to pay the expenses of a committee, composed of members of the council, while in attendance upon the American Municipalities Convention at Detroit, Michigan. The council was authorized to appropriate money for certain enumerated and "other public purposes." The court held that the expenses of the committee in attendance upon the convention, although highly educational in equipping the members of the council for the discharge of their official duties, was too remote to be regarded as a public purpose, and an injunction was issued enjoining the payment.

The James case involved the right of a member of the city council of Seattle to reimbursement out of the city treasury for his expenses while visiting other cities outside of the state for the purpose of securing information concerning "waterworks, street paving, street lighting, terminal facilities and other municipal matters, which are now, and constantly will be, coming before the legislative and executive departments (of the city) for consideration." The expenses were expressly provided for by an ordinance authorizing the tour of inspection. It was argued in behalf of the councilman, with much more plausiblity than may be done in this case, that the information he obtained, though educational in its nature, directly inured to the benefit of the city taxpayers whom he represented by better equipping him to look after such matters for his city, but the court took a different view, and in doing so said: "And we think the rule thus announced is the established one, and in consonance with all sound authority."

In the Lake county case the party seeking to recover the expenses was the superintendent of the Lake county poor asylum, and his expenses were incurred in attending, after a written request to do so by the secretary of the Board of State Charities, a national meeting of state charity organizations.    Notwithstanding the involved statute required the county superintendent to "be guided by suggestions which may be made to him by the Board of State Charities" (and which was done in that case) the court held that he was not entitled to his expenses, and in doing so said:

> "It may be, and doubtless is, true that meetings such as those attended by appellee and his wife have their educational value, but that fact would not, in and of itself, authorize the allowance of the claim. On the same theory, boards of commissioners would be authorized to pay the personal expenses of circuit judges and prosecuting attorneys incurred by them while attending state and national bar associations. Public officers are presumed to have the neccessary qualifications."

In the Smith case the claimant whose expenses were involved was president of the board of education of the city of Omaha.    It directed him to attend the "Fourth International Congress on School Hygiene to be held at Buffalo, New York," and to visit other technical schools. He expended $250.00 in making the trip, but he was not allowed by the court to recoup it upon the ground that the expenses were not incurred (except remotely) for a public purpose, to defray which the public funds could be appropriated, and in doing so the opinion said:

> "Counsel for appellants believes that modern conditions require a more liberal rule.   While it cannot be disputed that the municipality might derive great benefit from what its delegates might learn at the convention, yet experience has shown that when the control of a fund and the use of it may be lodged in the same person, a situation arises which is subject to such flagrant abuses that courts have thought that this was an additional reason for the rule of strict construction made to protect the rights of taxpayers."

The fact that the court also found that the expenses incurred in attending the international convention were

intermingled with those incurred in visiting the "technical schools" formed no basis for the opinion. The fact of commingling was adverted to only for the purpose of showing that *if* the expenses in attending the school were legitimate (but which was not decided), they could not be separated from the illegal item of expenses of attending the convention. Other cases besides those mentioned above are Gregory v. Bridgeport, 41 Conn. 76 19 Am. Rep. 485, and Austin v. Coggeshall, 12 R. I. 329, 34 Am. Rep 648.

But it is argued that all of the above cases except the Waters, James and Lake county ones are not applicable to the question here involved, because their facts were not identical with those of this case, and, because of the peculiar phaseology of the statutes involved in each of them. That same argument is made with reference to the Snider case *supra*, but which we have hereinbefore pointed out is a wrong interpretation of our opinion therein. The essential question determined by the court in each of the cases referred to was, that the *expending of public funds* in attendance upon conventions of voluntary organizations, either within or without the state, was *not* for a *public purpose,* nor were they incurred in the discharge of *official duties,* although some of them were where the expenses were incurred by officers whose primary duties were to improve, maintain and carry out the educational system of the state, and the attendance by them upon the particular convention named was much more directly calculated to further that purpose than the expenses incurred by appellant in the official business, as his counsel claim, of better equipping his office of Auditor in discharging its multiplied duties.

In view of the foregoing we do not feel authorized, especially in this period of great private and public extravagance, to sanction the character of expenses here involved without express legislation permitting or requiring it, or to overrule all the courts before which the question has been presented, solely upon what might be termed the fantastic or Utopian ground that we are living in a day of rapid progress and increasing the duties of government to meet modern conditions. Such an argument loses sight of the fact that an increase of official duties does not change their nature. The change is only in degree or amount and not in kind or character. The true definition of "official duties" and "official business" is not affected by multiplication. They are the

same now that they have ever been, and for us to adhere to these long settled definitions is not to assume a provincial attitude.

But it may be insisted that in view of the fact that the legislature since the opinion in the Snider case has legalized the expenses therein disallowed, and has also expressly provided for the expenses of county tax commissioners convening in conventions at Frankfort once each year and paying their expenses in doing so (section 4114i-12); and, further, also provided by an act at the 1926 session of the legislature (now section 4396-9 of the Supplement to the Kentucky Statutes) for the attendance by the Superintendent of Public Instruction at public expense upon educational conventions and conferences within or without the state, it has thereby adopted a policy which we should follow in this case and to thereby hold that the expenses here involved are recoverable. But we do not give the force and effect to those statutes that the argument does. On the contrary, the fact that the legislature, when it saw proper to authorize such expenses, did so by express enactment, is strong evidence to our minds that it did not intend to do so where the involved statute was silent upon the subject. We, therefore, conclude that the expenses here involved were not incurred in the discharge of any "official business," and which brings us to the second argument above.

2. In disposing of argument (2), we deem that little need be said. In the first place (waiving the question of the constitutionality of the statute under the opinions in the cases of Pratt v. Breckinridge, 112 Ky. 1; Williams v. Wedding, 165 Ky. 361; Green v. Caldwell, 170 Ky. 571; L. & N. R. R. Co. v. Greenbrier Distilling Co., 170 Ky. 775, and Hoblitzell v. Jenkins, 204 Ky. 122, if this argument be correct), the language of section 53 of the statutes *supra,* is susceptible to no such construction as is attempted by counsel. The first part of the section prohibits the incurring of any expenses on trips outside of the state "except on official business." Immediately following that language, and separated only by a comma, is this: "and then only after a request to make such trip has been filed in writing with the Commissioners of the Sinking Fund," etc. There is nothing in the language remotely intimating that it was the intention of the legislature to vest the Sinking Fund Commissioners with authority to determine whether or not the trip was to be made on

*official* business. As hereinbefore intimated in discussing argument (1), it was clearly the intention of the legislature to submit to the Sinking Fund Commissioners the propriety and wisdom of incurring the expenses, notwithstanding the trip might be indisputably in the discharge of official duties. The reason for it, we have likewise heretofore pointed out. In each of the cases hereinbefore discussed the involved expenses had been passed on by the respective boards and councils whose duties it was to do so, and the court in each case held that such actions by the boards of the city councils did not deprive the court of its right to inquire into and adjudicate the question as to their validity; and in the Waters, Snider and Lake county cases the language of the involved statutes more strongly indicated the conclusiveness of the action of the board or superior authority in passing upon the propriety of the expense, than does that of our statute under consideration, but the court, nevertheless, took jurisdiction and adjudicated the validity of the expenses involved, and such has been the uniform course of this court under similar or analogous circumstances.

The fiscal courts of counties have exclusive management of their fiscal affairs. They pass upon the validity of claims against the county as well as the propriety of contracts which it makes on behalf of the county. In doing so it necessarily determines that its action is valid, but that determination has never been considered as conclusive and may always be inquired into by appropriate procedure. Even the action of the legislature itself in passing a particular statute does not conclude the courts from determining its constitutionality, and such is the case where it attempts to appropriate public funds, which it may do for *public purposes* only. In making such appropriations it necessarily determines that they are for public purposes, but the courts are not thereby barred or concluded, as is illustrated by the Harp case *supra*, and other similar ones. Moreover, it will be observed that in the Smith case *supra,* the court observed: " Yet experience has shown that when the control of a fund and the use of it may be lodged in the same person, a situation arises which is subject to such flagrant abuses that courts have thought that this was an *additional* reason for the rule of strict construction made to protect the rights of taxpayers." With us, the Board of Commissioners of the Sinking Fund is composed of designated state officers, one of whom is the Auditor of Public

Accounts. Other national conventions of the state officers filled by other members of the board are or might be organized. Each of them might desire to attend his association's respective national convention, and it is thereby rendered easy to see why its authority to make the trip or trips should not be conclusive upon the court. Of course, we do not mean to intimate that any of the present members of the board could or would be influenced by any such consideration, but the circumstance, nevertheless, furnishes "an additional reason for the rule of strict construction made to protect the rights of its (state's) taxpayers."

Before closing the opinion, which is now already too long, it is proper to say in behalf of appellant that the case was really manufactured by him for the sole purpose of obtaining a construction of the statute and a consequent declaration of his duties as Auditor of Public Accounts, since he must issue all warrants of a similar nature to whomsoever payable. It expressly appears in the record that he procured the check and collected it in order to make a case wherein the question could be tested; and after doing that he expressly requested the Attorney General to bring the suit, all of which he declares in his pleading and which the Attorney General confirms. So that, his motive can be viewed in no other light than a worthy one, and not for any selfish purpose.

For the reason indicated the appeal is granted, and the judgment is affirmed. Whole court sitting, Chief Justice Clay and Judges McCandless and Dietzman dissenting.

### DISSENTING OPINION OF JUDGE DIETZMAN.

In so far as the opinion of the court in this case holds that the expenses incurred by the appellant in attending the meeting of the state auditors held in Salt Lake City in the summer of 1924 were not incurred by him while in the performance of "official business" within the meaning of that phrase as it appears in section 53 of chapter 112 of the Acts of 1924, I must dissent.

As I understand the record, the meeting of the state auditors in question was a gathering of such officials of various states of the Union to discuss questions and problems bearing on the improved performance of the duties of their respective offices. While, of course, the details of those duties vary from state to state, the funda-

mental problems of proper auditing, such as what is the best system of bookkeeping or accounting, the best system of the distribution of duties among the deputies of the office, the best methods in handling the business of the office, are common to all:

The question before us, of course, turns on what interpretation we should put on the expression "official business" appearing in the statutes. It seems to me that but slight reflection on how the business of this state and its large municipalities has grown by leaps and bounds in the last 20 years, bringing in the train of such growth new, intricate, and perplexing problems pressing for correct solution, dictates a broader, more comprehensive, more sympathetic attitude towards the interpretation to be put on the expressions "official business" and "public purpose" than the majority opinion does. In the past decade, we have seen the creation of the state highway department, with annual receipts and disbursements running up into the millions. We have witnessed the unparalleled growth of the automobile department and the birth of the motor bus department. The schools, the state board of charities and corrections, the agricultural department, the state forestry department, the Workmen's Compensation Board, the newly created state purchasing department, and all the other departments of our government, have not lagged behind, but have kept pace with the growth of our state and country. Necessarily, their problems of proper administration increase in intensity and intricacy in proportion to their growth. I take it that it will be conceded that the proper administration of the business of the state and its large cities requires just as much thought, just as much planning, just as much information, just as much aid and assistance, that can be obtained from the experience of others, as does the business of any large corporation doing a business of equivalent size and variety, and collecting and expending like amounts of money. It is a matter of common knowledge that large and successful corporations not only encourage, but also require, their executives to attend national conferences of those engaged in like business, where the problems confronting the business are threshed out, new ideas acquired, and valuable information gained, all of which materially assists such executives in the improvement of the administration of the business of such companies. For instance, there is a national association of

those engaged in the street car business. The discussions of the problems of safety, of operation, and of transportation which have taken place at these meetings have assisted materially the executives of such companies in the reaching of the proper solution of such problems confronting their own respective companies.

If such meetings benefit such executives and the companies they serve, why should not the state and its large municipalities avail themselves of like opportunities? Having once been city attorney of the city of Louisville, I know that the street cleaning department of that municipality has obtained much valuable information concerning the many problems confronting it, of garbage disposal to mention but one, and has been materially helped in its effort to reach a proper solution of others by reason of the attendance by the head of the department on national conventions of like departments of other cities. Undoubtedly like conferences on traffic problems would benefit all municipalities attending. Justly proud as we are of our state, we must yet realize that life is dynamic, and not static; that we must move forward, or we will retrograde; that we must give the best that is in us to the study of the administration of the business of our beloved commonwealth; and that we should not scorn, but, on the other hand, welcome, the assistance to be gained from the experience of others engaged in like tasks. It is this idea that stood behind the creation of our efficiency commission, whose report suggests many questions warranting serious thought. Its report on the system which has prevailed for so many years in the auditor's office and its recommendations for changes in that system demonstrates that all thinking men do not agree that perfection resides in that system. Our Legislature has recognized the value of these conferences of officials engaged in like work.

Speaking first of purely local conventions, we find that the Legislature has enjoined upon all the county tax commissioners the coming together each year, at the expense of the state and counties, under the tutelage of the state tax commission for the purpose of instruction and discussion. Kentucky Statutes, section 4114i-12 (10). No one who reflects upon the improvement in the administration of our tax laws can avoid giving due credit to these meetings for the help they have given in that improvement. Our Legislature of 1926 authorized the state superintendent of public instruction to call like

meetings of boards of education, boards of trustees, superintendents, supervisors, teachers, and all employees of the public school system at the expense of the school system. Kentucky Statutes, section 4387. In this same school law it authorized such state superintendent to attend, at the expense of the state, "educational associations, conventions and conferences, whether within or *without the state, for the purpose of keeping informed and familiar with progressive educational policies and practices, that the schools of the state may be more efficiently served."* (Italics mine.) Kentucky Statutes, section 4396 8. The Legislature has enjoined upon the state board of charities and corrections the duty of studying the sources and causes of crime, delinquency, and dependency, and, as far as possible, to suggest and put into effect such remedial measures as may be of benefit to this commonwealth in the prevention and ultimate eradication of anti-social acts and conditions. Kentucky Statutes, section 216a-3. Surely the Legislature did not mean to require the board to make bricks without straw and to shut it off from any source of information or help it could obtain in the solution of such a complex problem, even though it comes from our sister states.

Thus we see that the Legislature has been forward looking, and has recognized the value of meetings and conferences like the one here in question, not only those confined to this state, but also those national in character.

While much of the details of the duties of the appellant as state auditor is enjoined by law, yet he may no doubt improve the discharge of those duties as enjoined by law, and he may from his study and experience be of great help to the Legislature in suggesting to it and in assisting it in the framing of such new legislation designed to improve the service. To paraphrase the statutory authority vested in the superintendent of public instruction above noted, the auditor, as well as the heads of the other departments, should be encouraged to keep informed upon, and familiar with, the progressive policies and practices pertaining to their respective offices to the end that the state may be more efficiently served. While, of course, the state should not be required to pay for the education of one elected to office in order that he may fill the duties of that office, it does not follow that the state should not bear the expense of the

acquirement by such officer of such additional knowledge as tends to improve the service. The distinction to me is obvious. I am therefore clearly of the opinion that expenses so incurred may, and should properly, be classified as incurred while on "official business" within the meaning of the Budget Law of 1924.

I am not alarmed by the suggestion that my views put it into the power of the appellant or other state officer, who may be authorized to incur expenses in the performance of official business, to attend all kinds of meetings whether of value or not, and so run up the expenses of the state out of all proportion to the benefits' received. In the first place, the Legislature has, in the Budget Law, limited the gross amount that may be spent on all the expenses of the appellant's office, and, in the second place, he may not, under section 53 of the act in question, make any trip out of the state even though on business all will concede to be official, until such trip has been approved by the sinking fund commission. Surely these admirable safeguards sufficiently protect the state and the treasury.

But it is said that authority, both from this state and other jurisdictions, is overwhelmingly against my position. I do not so read it. I will first consider that from this jurisdiction. The case relied upon, that of Beauchamp v. Snider, 170 Ky. 220, 185 S. W. 868, when analyzed, certainly does not militate against my views. That case turned on the interpretation to be put on subsections 6 and 7 of section 4399 of the Kentucky Statutes, 1915 edition, the first of which read:

> "The county board of education shall have power to pay the *necessary* expenses of the county superintendent . . . while in the discharge of official duties;"

and the second of which subsections read:

> "The county board of education shall have power to place into one common school fund the state fund received from the state treasury as is now provided by law, and the fund raised in the county by tax levy, and distribute said common school fund *in the county* for the purpose of . . . such other expenses as are necessary in making an efficient system of schools in the county." (Italics mine.)

So far as pertinent to the case before us, there was involved in that case the question whether or not the county school superintendent was entitled to be reimbursed for the sum of $31.65 expended by her in attending a session of the Kentucky Educational Association in Louisville, and in the payment of membership fees in such association for each of the trustees of the county, these fees being $1.00 each. This court said, first, that under the sections of the statutes above quoted the county school superintendent could not incur any expenses chargeable against the school fund, unless they had been previously authorized, and, since these expenditures had not been previously authorized, the county board could not reimburse her for them. Secondly, this court held that the particular expenditures involved were not expended *in the county,* and the statutes required that they be expended in the county. This was enough, as the court *expressly* said in its opinion to dispose of this case. But the court then went on to determine whether or not these particular expenses were "necessary expenses."

It will be noted that the court did not undertake to say whether or not these expenses were for a public purpose or were incurred in the discharge of official business, but only whether or not they were *necessary* expenses, since the statute confined the expenses to such as were *necessary.* This court held that the expenditures involved were too remote to the making of an efficient system of schools in the county as to come within the meaning of "necessary expenses." I confess that I do not agree with the court's conclusion in this regard, though I admit it to be the declared law of this state. But at least it does not shut the door to the determination that these expenditures, while they may not have been *necessary* in that case because too remote, were not for a public purpose or incurred in the discharge of official business, though such official business was not authorized, since too remote. I do not therefore regard the Beauchamp case as conclusive of the question here involved.

Passing to other jurisdictions, we find a number of cases collected and annotated in L. R. A. 1917E, 331. Let us analyze each of these cases. The case of Hitchcock v. State, 34 S. D. 124, 147 N. W. 284, is not in point. That case turned on the interpretation the South Dakota court put on a statute prohibiting the payment to members of

any state board of his expenses in attending any political meeting, state fair, or other public meeting of like character. It held that the state board of regents of education had no right to have its expenses paid for a special meeting of the board held in a city where a state fair was in session, which state fair the members attended. Similarly the case of Smith v. Holovtchiner, 101 Neb. 248, 162 N. W. 630, L. R. A. 1917E 331, turned on the interpretation the Nebraska court put on the statute authorizing the expenditure of school funds. The court said that the statute authorized the expenditure of school funds *only for the school purposes named in the statute* (italics mine); that is, the support of schools, school sites, and the erection and furnishing of school buildings. Hence the court declined to uphold the payment of the expenses of the superintendent of the schools who had been directed by the board of education of Omaha to attend the fourth international congress on school hygiene to be held at Buffalo, New York, and to visit several technical schools there. In so far as the expenditures in attending the convention were concerned, the court said that such attendance had nothing to do either with the support of the schools or the erection and furnishing of school buildings. The court intimated that the expenses incurred in visiting the technical high schools might have been allowed, but, because these latter expenses were so intermingled with the expenses in attending the congress on school hygiene as not to be able to be separated, the whole claim had to be disallowed. Of course, in the absence of authority to expend public funds for other than those specifically enumerated, the court could reach no other conclusion than it did. In the case before us, however, the auditor is specifically authorized to incur traveling expenses on official business in the state, and also out of it when his trip is approved by the sinking fund commission, as was done in this case.

The cases of Austin v. Coggeshall, 12 R. I. 329, 34 Am. Rep. 648, and Gregory v. City of Bridgeport, 41 Conn. 76, 19 Am. Rep. 458, relied on by the Nebraska court in this Smith case *supra*, are neither in point. The Rhode Island case involved the legality of an appropriation by the city council of Newport for a ball to entertain the officers of a British war vessel then in port, and it was held that this was not a regular, ordinary, or usual expense of the city. The Connecticut case involved the right of the city to reimburse a wharf master for dam-

ages he had had to pay out in the negligent discharge of his duties as a wharf master. The case of Stevens v. Board of Commissioners of Sedgwick, 5 Colo. App. 115, 37 Pac. 948, found in the L. R. A. note like the other two discussed, also turns on the interpretation to be put on the statutes authorizing the expenditures of school funds. The Colorado court said that the statute only authorized the county school superintendent to be paid for duties enjoined upon him by law, and that the law did not enjoin upon him the duty of attending a "district normal." It is obvious that this case, too, goes off on the statute. I admit that the two cases of Waters v. Bonvouloir, 172 Mass. 286, 52 N. E. 500, decided in 1899, and James v. Seattle, 22 Wash. 654, 62 P. 84, 79 Am. St. Rep. 957, decided in 1900, are contrary to my views. In the Massachusetts case the question turned on the validity of an appropriation made by the town of Holyoke to defray the expenses of a committee consisting of the mayor and four aldermen in attending a convention of the American municipalities at Detroit, Michigan, the object of which was a discussion and study of all questions pertaining to municipal administrations, and of contemporaneous municipal affairs, and the establishment and maintenance of a central bureau of information for the collection, compilation and dissemination of statutes, reports, and all kinds of information relative to municipal government. The Massachusetts court, speaking through Field, C. J., held that this appropriation was not for a public purpose. The only reasoning the court gave to support this conclusion is contained in this quotation:

> "The purpose apparently is to educate the committee generally with reference to all questions pertaining to municipal administration anywhere. It is not confined to the ascertainment of facts for the information of the board of aldermen of the city of Holyoke concerning actions pending before the board. . . . The general education of the mayor and aldermen upon all matters relating to the municipalities of the United States and Canada, is not, we think, a public purpose, and cannot be paid for out of the funds of the city."

Unless this opinion can be supported on the theory that Holyoke was then a small place, with problems not so intricate or involved as that their solution could be helped by the experience of other municipalities or on

the idea that municipal administration in the late 90's was not as complicated as we know it to be now, then I think it is faulty in the fundamental premise on which its syllogism is based. The education of governmental authorities in the experience of others engaged in like character of work does tend directly to better the public service all round, and so doing is certainly a public purpose. However, I think the case may be differentiated as I have indicated. But, it may be argued, that, if the purpose of the appropriation in the Massachusetts case was not "public" in the late 90's the subsequent increase in the complexity of municipal administration cannot change its character. I can answer this best by simply quoting that part of the opinion of the Supreme Court in the case of Village of Euclid, Ohio, et al. v. Amber Realty Company, 47 S. Ct. 114, 71 L. ed. ——, which involved the zoning law of that village, reading:

"Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. *And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise.* But although a degree of elasticity is thus imparted, not to the *meaning,* but to the *application* of constitutional principles, statutes and

ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall.'' (Italics mine.)

The Washington case *supra* involved the validity of an appropriation for the expenses of a special committee of the city council of Seattle appointed to visit certain cities in the East for the purpose of securing information on the subject of waterworks, street paving, street lighting, terminal facilities, and other municipal matters. Without any discussion or giving any basis for the result it reached, the court said that the payment could be sustained only on the ground that these expenses were necessary expenses incurred in the performance of official duties which must be such expenses as are strictly essential to municipal purposes, and that therefore these expenses were not necessary expenses. Unless this case can be differentiated like I think the Massachusetts case may, then I think it is wrong in principle. The case of Attorney General v. Murphy, Wayne Circuit Judge, (1909), 157 Mich. 615, 122 N. W. 260, is hardly in point, though the language of the court in some measure sustains my views in this case. These are all the cases which have been cited to me or that I have found bearing on the question before us. I do not think there is such an overwhelming mass of authority even if the Massachusetts and the Washington cases may not be distinguished as to compel us to take the view that the expenses here involved were not incurred in official business. To my mind they were. I will not discuss the other contentions of the commonwealth advanced in opposition to the payment of these expenses based on the lack of receipts and the alleged unconstitutionality of the Budget Law because of an alleged defect in the title of the Act, since such discussion would serve no useful purpose. Suffice to say that I do not regard them as possessing merit. I am therefore of opinion that the judgment of the lower court should be reversed, with instructions to dismiss appellee's petition.

I am authorized to say that Chief Justice Clay concurs in the views herein expressed.

DISSENTING OPINION BY JUDGE McCANDLESS.

W. H. Shanks as auditor of the state of Kentucky was invited to attend the National Convention of State Auditors which convened at Salt Lake City on August 8, 1924. Previous to that date, conceiving that attendance at the convention was official business connected with the duties of his office, he requested permission of the State Board of Sinking Fund Commissioners to attend, which request was unanimously approved by a minute regularly entered on the records of that board. In conformity therewith he attended the convention and upon his return filed claim against the state for the amount of his traveling expenses, $269.75. In the meantime the attorney general had reached the conclusion that the expenditure was not a valid claim against the state and advised against its payment, whereupon Mr. Shanks, as auditor, paid the amount of the claim to himself and requested that suit be filed to test the validity of his claim and to obtain a construction of the act under which he had proceeded. Later the attorney general brought this action in the Franklin circuit court to recover the sum so paid. Mr. Shanks filed answer setting up the character of the convention; the fact that the board of sinking fund commissioners had approved his request for permission to make the trip, and the statutory provisions upon which he relied. A demurrer was sustained to this answer, and failing to plead further judgment was rendered for the state for the amount of the claim, from which judgment this appeal is prosecuted.

Prior to the year 1920 there does not seem to have been any specific authority for the expenditure of state funds for traveling expenses out of the state on official business, but in that year the budget system was adopted and since has been substantially followed. In the Budget Act of 1924, chap.—, sec. 4, it is provided:

"There are hereby appropriated out of the general expenditure fund for the use of the department of auditor of public accounts of the commonwealth of Kentucky for the fiscal year ending June 30, 1925, as hereinafter set out the following sum for the following purposes: (a) for salaries and clerical hire $35,000.00; (b) for providing stamps, office supplies and necessary traveling expenses $4,000.00."

Similar provision for the payment of traveling expenses for the State Board of Agriculture appears in section 8; for the banking department in section 12; for the state tax commission in section 19; for the state inspector and examiner in section 20, and perhaps there are some others. As applying to all of the departments section 53 of the act provides:

"No officer or employe of the state or any of the departments, boards, commissions, agencies of the state government provided for in this act shall be allowed any expenses incurred on trips outside of Kentucky except on official business and then only after a request to make such trip has been filed in writing with the commissioners of the sinking fund and authority to make same has been approved by said commissioners of the sinking fund."

Appellant insists (1) that the trip in question was official business; (2) that the board of sinking fund commissioners was given exclusive discretion to determine the character and necessity of trips outside the state and the propriety of paying expenses incurred thereby.

(1) As to whether this expense was incurred on official business is a debatable question, though if it alone was being considered I would concur with the majority opinion.

(2) The expense, however, was regularly approved by the board of commissioners, and to my mind the case turns upon the effect of that action. We have seen that the legislature appropriated $4,000.00 for printing, stamps, office supplies and necessary traveling expenses of the auditor's office, thus clearly including expenditures for traveling expenses both within and without the state. Such expenditures, of course, are confined to official business, though not so stated in section 4. Perhaps it would have been difficult to have defined the nature and extent of expenses to be paid out of such funds and the legislature made no attempt to do so. It did, however, safeguard the people against the improvident use of public funds outside of the state by providing in section 53 of the act that the right to incur such expenses should be restricted to official business and be approved by the commissioners of the sinking fund, a body composed of the governor, attorney general, auditor, treasurer and secretary of state. Just what power

did the legislature intend to confer on that body? It is suggested that under the statute the board can merely pass on the usefulness or necessity of the proposed expenditure and give or withhold its approval accordingly, but that this does not include a consideration of the question as to whether the trip is on official business, and that this question *must* be decided by some other tribunal. To my mind such a construction renders the action of the board mere child's play. For it (the board) to approve a claim, however useful, which it knew or believed not to be on official business would be an absurdity; for it to approve such claim regardless of whether or not it was to be incurred on official business would be equally illogical. Certainly it was not contemplated that an officer should procure a declaratory judgment before presenting his request to the board for its approval, and no other provision is made for a determination of that question, and unless the board has jurisdiction to determine that question its approval of such request is farcical and of no value. But the legislature was not doing a vain thing, and if the act can reasonably be given a practical construction, this should be done. When thus considered, while the act is not skillfully drawn, the legislative intent is reasonably clear. The trip on which the expenses are incurred must be on official business, presumably must be useful or necessary to the state, and must be authorized by a formal approval of the board upon written request of the officer. In thus empowering the board, composed of the highest administrative officers of the state, including the head of the legal department, to pass upon the request for the proposed trip before the expenses are incurred and to reject such request, or by its approval to authorize such trip the legislature must have meant that approval of the request and authority to make the trip upon the part of the board would authorize the payment of the necessary traveling expenses incurred on the trip and for the board to consider all questions affecting its judgment in the matter. The request is approved as a whole. To do this each of its constituent parts must meet the sanction of the board. To give or withhold its sanction the board must consider the entire matter. Also such consideration requires discretion; clearly it was intended that this discretion should be exercised by the board, and, if not abused, its action should be upheld. When power and discretion to determine a certain matter is committed to a public board by

the legislature the courts will not interfere with the exercise of that power unless the board has abused its discretion or exceeded its jurisdiction. This is so well settled as not to require citation of authority. Certainly in this case the board acted within its *jurisdiction* in determining both the usefulness and the official character of the trip. Certainly the question was debatable. Even this court is divided upon it, the chief justice and one associate justice holding that the business was "official," hence it cannot be said that in so holding the board acted arbitrarily or abused its discretion, and its action should be upheld.

As I view it, the majority opinion ignores all legal inferences to be drawn from the language of the act, and erroneously assumes that, because jurisdiction to pass upon the question of "official business" is not in express terms conferred upon the board, such jurisdiction cannot arise by necessary implication.

Again, its whole argument seems to be directed against the conclusiveness (?) of the board's action. No one contends that such action is conclusive in all cases or that the validity of a legislative act cannot be inquired into by the court. Aside from appeals from fiscal courts, any number of cases may be found in which administrative boards and municipal bodies have made an illegal contract or exceeded their jurisdiction or acted arbitrarily or abused their discretion in which the courts have interfered. Such was the case in Snider v. Beauchamp, cited and relied upon as authority in the majority opinion, but in that case the court quoted with approval from Logan County v. Board of Education, 138 Ky. 98, thus: " 'That the statute was intended to and does invest the board of education with a large discretion in the expenditure of the funds levied for the benefit of the schools and so long as this jurisdiction is not abused or is reasonably exercised the courts will not interfere with it.' "

And continues: "If this jurisdiction shall be abused or should not be reasonably exercised either in the character of the expense or in the mode or method by which they should be levied the courts will interfere upon proper application." It further concluded that the board of education of Spencer county had abused its discretion and found accordingly.

Lake County v. Nuenfeldt, 136 N. E. 580, relied upon in the opinion is not in point on this question. There the statute authorized the state superintendent to make suggestions to the keepers of the county poor asylums. Acting under such suggestions Nuenfeldt attended a meeting of a charity organization and the county paid his expenses. There was no statute authorizing the payment of such expenses, and the court held they should not have been allowed. That case presented an entirely different state of facts from this one. Here the statute makes a definite and fixed appropriation to a state department for certain enumerated expenses. One item relates to traveling expenses without the state on official business, which can be incurred only upon request to the administrative board and when approved by it in writing, necessarily implying that such approval embraces both the character and the usefulness of the proposed trip. As I view these cases, neither militates against the views expressed *supra*. The opinion cites none other and I have been able to find none, though of course the cases may differ as to what constitutes an abuse of discretion, or acting without jurisdiction.

For the reasons indicated I respectfully dissent.